782 F.2d 1042
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
MARGARET MURRAY, Personal Representative of the Estate of
William A. Murray, Deceased, Plaintiff, MASSEY
FERGUSON, INC., a foreign corporation,
Defendant-Appellee, Defendant-Appellant,
v.
GATES LEARJET CORPORATION, Third-Party Plaintiff-Appellant,
Plaintiff-Appellee, UNITED STATES OF AMERICA,
Third-Party Defendant-Appellee.
 84-1660, 84-1661, 84-1662
 United States Court of Appeals, Sixth Circuit.
 12/3/85
 
 Before: LIVELY, Chief Judge; JONES and WELLFORD, Circuit Judges.
 WELLFORD, Circuit Judge.
 
 
 1
 These cases, treated as one by the district court, arise from the crash of an airplane on January 19, 1979, during its landing approach at Detroit Metropolitan Airport. The estate of William A. Murray, a passenger killed in the accident, brought these actions against various defendants, including Gates Learjet Corporation (Gates Learjet), the manufacturer of the aircraft; Massey-Ferguson, Inc. (Massey), the lessee of the aircraft, whose employee and independent contractor comprised the crew of the plane at the time; Management Jets, International (MJI), the owner of the aircraft; and the United States, whose employee was operating the airport control tower and was controlling the aircraft and other air traffic at the time. Massey and MJI have been jointly represented throughout the trial and on appeal.
 
 
 2
 Gates Learjet was alleged to be liable for negligence and breach of warranty in the design of the aircraft, specifically involving the alleged failure of the stall warning and prevention systems to operate when small amounts of ice formed on the wings. Massey, as employer of the pilot and supervisor of the copilot, was alleged to be liable for the actions of the crew in negligently permitting the aircraft to reach stall speed, causing an aerodynamic stall from which they were unable to recover in the remaining altitude. MJI, the owner of the aircraft, was alleged to be liable for the negligence of the crew under the Michigan aircraft owner liability statute. The United States was alleged to be liable for the acts of its employee, an FAA control tower operator, who allegedly gave incorrect information to the aircraft's crew and did not assure adequate spacing between the Learjet and an aircraft then taking off from the same runway.
 
 
 3
 Pursuant to a funding agreement, four of the parties, Gates Learjet, the United States, Massey, and MJI, paid $1,750,000 to the plaintiff in final settlement of their liability to the Murray estate. This payment was made pursuant to a settlement agreement which allowed each of the four defendants to litigate their respective fault and seek contribution and/or indemnity from each other.
 
 
 4
 The matter then proceeded to trial on the claims for contribution and indemnity. The district court ruled that the liability of the United States would be determined by the court as the trier of fact pursuant to the Federal Tort Claims Act. Thus the jury determined the respective fault of Gates Learjet, Massey, and MJI, while the court determined the fault of the United States. The jury found that Massey and MJI were eighty percent (80%) at fault, while Gates Learjet was twenty percent (20%) at fault. The district court ruled that the United States had no liability for the accident thus was responsible for no part of the award.
 
 
 5
 Two appeals are now before this court. First, Gates Learjet, Massey, and MJI appeal from the district court's finding that the United States was not liable, and Massey and MJI appeal the district court's award of costs in favor of the United States. Gates Learjet, Massey, and MJI assert on appeal that the district court erred in using an improper standard for proximate cause under Michigan law where an intervening cause existed.
 
 
 6
 Second, Massey and MJI appeal from the jury verdict apportioning liability among Gates Learjet, Massey, and MJI, while Gates Learjet appeals the district court's denial of costs against Massey and MJI. Massey and MJI assert on appeal that the district court abused its discretion in excluding FAA Airworthiness Directive 79-12-05 from evidence; that the district court erred in giving an erroneous instruction to the jury on the manufacturer's duty to warn; and that the district court erred in failing to grant a motion for mistrial by Massey and MJI.
 
 
 7
 On January 19, 1979, a Gates Learjet Model 25D, identified as N137GL, crashed on the Detroit Metropolitan Airport runway while making its landing approach. The aircraft crossed over the approach end (or 'threshold') of the runway in level flight and then aerodynamically stalled[1], causing its right wing tip tank to strike the runway. The plane then cartwheeled on the runway, killing the pilot, copilot, and all four passengers aboard. Prior to the accident, the crew of the Learjet had been in constant communication with the Detroit Metropolitan Airport control tower, which was operated by employees of the Federal Aviation Administration (FAA), an entity of the United States.
 
 
 8
 Approximately five minutes before the crash, air traffic control of the Learjet was handed off from en route services to local control. Jack Dewolf, an FAA employee, was the air traffic controller at Detroit Metropolitan Airport responsible for local control of the Learjet and other aircraft arriving and departing at that time.
 
 
 9
 Although there was ice on the runways, the night was clear, visibility was good, and DeWolf was in constant communication with arriving and departing aircraft on the ground and in the air, including Delta Flight 713, a DC-9 commercial airliner waiting to depart. As the Learjet approached the airport, Delta 713 was on the ground and taxing to takeoff position at the end of the same runway on which the Learjet was eventually cleared to land. DeWolf cleared Delta 713 to take off and, shortly thereafter, also cleared the Learjet to land. During this time, DeWolf advised the Learjet's crew that Delta 713 was 'rolling good' and that the spacing between the two planes was 'going to be adequate.'
 
 
 10
 When both departing and arriving aircraft use the same runway, as on the night of the accident, the air traffic controller has the duty to assure adequate spacing between aircraft. In this case, the FAA Air Traffic Control Manual Sec. 12 (1979) requires a departing DC-9 to be 6,000 feet down the runway and airborne before an arriving aircraft crosses the runway threshold. Although DeWolf testified that this minimum separation had been achieved, evidence of an expert reconstruction of the flight paths offered against the United States suggested that the final spacing between the Learjet and Delta 713 was no more than 3500 feet. There was uncontradicted expert testimony that the Learjet crew would have been able to see the position of Delta 713 as they approached.
 
 
 11
 The Learjet crashed due to aerodynamic stall. There was evidence that this Learjet Model 25D with a Century III wing modification in a landing confliguration (landing gear down and flaps down 40 degrees) would stall at approximately 87 knots. This stall speed, however, assumes a 'clean' wing without accumulation of ice. Flight tests indicate that even a small amount of a foreign material such as ice on the leading edge of the wing could disrupt the air flow over the wing and increase the speed at which the aircraft stalls. Because the Learjet Model 23 (predecessor of the 25D) did not comply with FAA regulations requiring an airplane to give the pilot adequate warning of an impending stall, the Model 23 and 25D were equipped with an artificial stall warning and stall prevention system. The stall warning system was a stick shaker which warns the pilot of a stall by shaking the control column.[2] The stall prevention system was a stick pusher, which was designed to prevent a stall by pushing forward on the control column. This safety device forces the nose of the aircraft down, decreases the angle of attack, and averts a stall.[3]
 
 I.
 
 12
 Gates Learjet, Massey and MJI argue that the standard applied by the district court to determine whether the actions of the air traffic controller were a proximate cause of the crash was not the proper standard under Michigan law, and that, even under the standard used, the district court's finding of no proximate cause is clearly erroneous.
 
 
 13
 Appellants rely upon the standard of proximate causation enunciated in Comstock v. General Motors Corp., 358 Mich. 163, 99 N.W.2d 627 (1959):
 
 
 14
 Where an act of neligence is a substantial factor in bringing about an injury, it does not cease to be a legal and proximate cause thereof because of the intervention of a subsequent act of negligence of another which contributed to the injury, if the prior act of negligence is still operating, and the injury inflicted is not different in kind from that which would have resulted from the prior act.
 
 
 15
 99 N.W.2d at 365 (citation omitted). The court further noted:
 
 
 16
 Even closer to point is 2 Restatement, Torts, Sec. 447:
 
 
 17
 'The fact that an intervening act of a third person is negligent in itself or is done in a negligent manner does not make it a superseding cause of harm to another which the actor's negligent conduct is a substantial factor in bringing about, if
 
 
 18
 '(a) the actor at the time of his negligent conduct should have realized that a third person might so act, or
 
 
 19
 '(b) a reasonable man knowing the situation existing when the act of the third person was done would not regard it as highly extraordinary that the third person had so acted . . ..'
 
 
 20
 Id. This two-part standard requires (1) that the original actor's negligence was a substantial factor in bringing about the events leading to the injury, and (2) that the second party's negligence was foreseeable. Although the district court might have enunciated this standard with greater clarity, we find that the court applied the proper standard under Michigan law and that its finding of no proximate cause is not clearly erroneous.
 
 
 21
 The district court, in its role as factfinder as to the claims against the United States, observed that, although sufficient evidence was offered at trial to support a finding of negligence on the part of the air traffic controller, it had no need to--and would not--reach this question, because 'the evidence failed to establish that it was more likely so than not that such negligence was a proximate cause of this unfortunate accident.' The court continued:
 
 
 22
 The reduction in the [Learjet's] speed to the point at which the plane would stall was not a natural, continuous and foreseeable result of the failure to assure minimum separation. Gates argues that the inadequate spacing caused the pilot to slow his aircraft, and that the accident resulted from the combined negligence of the air controller and the pilot. Yet, this causal chain beginning with the controller's negligence, is too remote to hold the United States liable for this accident. The evidence indicates that the pilot was concerned that the spacing might be a little tight; nonetheless, he elected to land the airplane. Gates' expert pilot, Carl Snow, testified that a pilot on a two-mile final approach who is concerned about spacing has two options: he could slow the plane in an attempt to increase spacing; or he could execute a missed approach (or go around) and attempt a second landing. The uncontroverted evidence proved that the pilots could have successfully gone around at any time, even after [the Learjet] crossed the threshold, and perhaps until the moment the plane stalled. While the lack of spacing may have been the pilot's motivation to slow the aircraft, it was the pilot who exercised his judgment to slow [the Learjet] to an unsafe speed.
 
 
 23
 (Emphasis added). The court went on to emphasize the good visibility on the night of the accident, the evidence that the Learjet crew had a clear view of Delta 713's position, and the final responsibility placed upon aircraft pilots under such conditions by FAA regulations, case law and custom to determine whether a landing can safely be made.
 
 
 24
 It is unclear whether the district court determined that the controller's assumed negligence was not a substantial factor in bringing about the injury or that the negligence of the Learjet's crew was not foreseeable or both. We are convinced, however, that the court properly evaluated the causal relation between the controller's assumed negligence and the reduction of the Learjet's speed to stall speed under Michigan law. At the very least, the court clearly analyzed the foreseeability of the reduction of speed, in light of the options obviously available to the Learjet's crew and the knowledge available to them, and found the actions of the Learjet crew not reasonably foreseeable under the circumstances.
 
 
 25
 The issue of proximate cause is an issue of fact subject to the clearly erroneous standard of review. In re Air Crash Disaster at New Orleans, 544 F.2d 270, 277 (6th Cir. 1976); Michael v. United States, 338 F.2d 219, 221 (6th Cir. 1964). 'A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' United States v. U. S. Gypsum Co., 333 U.S. 364, 395 (1948). In light of the clear responsibility and authority of pilots to make the final decision whether to land and the expert testimony introduced suggesting that until seconds before the crash the Learjet pilot could have executed a missed approach or slowed to a point above stall speed, we are not convinced that the district court's finding was clearly erroneous.
 
 
 26
 Gates Learjet further argues that the district court improperly denied it costs as a 'prevailing party' on its claim against Massey and MJI under Fed.R.Civ.P. 54(d).[4] The district court ruled that
 
 
 27
 [a]lthough the posture in which this case arose complicates the determination of which party prevailed, I am not persuaded that Gates was a 'prevailing party' within the meaning of Rule 54(d), and in any event, I exercise my discretion to deny Gates' request for costs.
 
 
 28
 . . . The prevailing party is '[u]sually the litigant in whose favor judgment is rendered.' Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d Sec. 2667 (1983). In the instant case, since the jury found Gates 20% liable for the accident, judgment was not entered in its favor. While it may be true that [Massey and MJI were] more at fault than Gates for the accident, Gates was nonetheless liable. Accordingly, I find that Gates is not a prevailing party within the meaning of Rule 54(d).
 
 
 29
 Further, the award of costs is within the sound discretion of the trial court. Wright, Miller & Kane, Federal Practice and Procedure: Civ. 2d Sec. 2668 (1983). More specifically, where '[n]o party to th[e] litigation prevailed completely . . . costs and legal fees rest largely in the discretion of the District Judge.' W. R. Grace & Co. v. Hargadine, 392 F.2d 9 (6th Cir. 1968). Even if Gates should be considered a prevailing party, I exercise my discretion to deny costs. I do not believe that a party found 20% liable for an accident should recover its costs from its joint tortfeasor. See Missouri Pacific Railroad v. Star City Gravel, 592 F.2d 455 (8th Cir. 1979) . . ..
 
 
 30
 We find no abuse of discretion in the district court's ruling on costs.
 
 II.
 
 31
 Massey and MJI offered into evidence 'FAA Airworthiness Directive 79-12-05' (AD), which the district court ruled inadmissible under Fed.R.Evid. 407.[5] Massey and MJI now argue that the district court's ruling was an abuse of discretion.
 
 
 32
 As the district court explained,
 
 
 33
 [a]n Airworthiness Directive (AD) is a document issued by the Federal Aviation Administration (FAA), and sent directly from the FAA to the consumer. [Massey and MJI] sought to introduce an AD, issued several months after this accident, which required: (1) an increase in the Learjet Model 25D's landing and approach speeds under certain conditions, and (2) a warning that 'even small accumulations of ice on the wing leading edges can cause aerodynamic stall prior to activation of the [stall warning and stall prevention system].'
 
 
 34
 The district court found that the AD was admittedly offered 'to prove negligence or culpable conduct'--specifically, that had Gates Learjet taken the steps outlined in the AD prior to the accident, they 'would have made the event less likely to occur. Although Massey and MJI argued that Rule 407 applies only to subsequent remedial measures taken by a manufacturer and thus should not exclude the AD since it was issued by the FAA, the district court concluded that 'nothing in Rule 407 limits its applicability to subsequent remedial repairs taken by manufacturers.'
 
 
 35
 The district court declined to follow Herndon v. Seven Bar Flying Service, 716 F.2d 1322 (10th Cir. 1983), cert. denied, 104 S. Ct. 2170 (1984), which, with minimal discussion, held an airworthiness directive admissible. We find more persuasive, as did the district court, the reasoning of Werner v. Upjohn Co., 628 F.2d 848 (4th Cir. 1980), cert. denied, 449 U.S. 1080 (1981) (admission of warnings FDA required drug manufacturer to issue subsequent to plaintiff's use of drug held reversible error under Rule 407). See also Vockie v. General Motors Corp., 66 F.R.D. 57 (E.D. Pa.), aff'd mem., 523 F.2d 1052 (3d Cir. 1975) (notice of auto recall required under federal law). As the Werner court noted, '[i]f subsequent warnings are admitted to prove antecedent negligence simply because [a government agency] required or might have required the change, then [manufacturers] might be discouraged from taking early actions on their own and from participating fully in voluntary compliance procedures.' 628 F.2d at 859. We find the district court's reasoning to be in accord with the policies underlying Rule 407.
 
 
 36
 Massey and MJI also argue that the district court erred in giving an erroneous instruction to the jury on the manufacturer Gates Learjet's duty to warn and in failing to give three instructions specifically proposed by Massey and MJI.
 
 
 37
 The district court instructed the jury that
 
 
 38
 the law requires that Gates Learjet, as the manufacturer and designer of the aircraft in question, has a duty to provide warnings to pilots of special dangers that may arise from the use of its aircraft. This duty includes a duty to provide warning of any dangerous conditions which are likely to be encountered while the aircraft is being operated.
 
 
 39
 I instruct you, though, that a manufacturer and a designer of aircraft has no duty to warn, and in this case to warn any pilots, of any danger which may be obvious to the pilots and known to them in their use of the aircraft.
 
 
 40
 In order for [Massey and MJI] to prevail on this claim, it must prove the following elements by a preponderance of the evidence: (1) that Gates Learjet knew or should reasonably have known dangerous conditions existed which could occur while its aircraft was being operated which were not obvious or apparent to the pilots. A failure to give an adequate warning, should you so find, would be negligence, if you find that a reasonably and ordinarily careful manufacturer of aircraft would have given warnings under the circumstances which you find existed in this case.
 
 
 41
 But I repeat: there is no duty to warn against hazards or dangers which are or should be obvious to the pilots or where the pilots have actual knowledge of them.
 
 
 42
 Transcript, J/A 1005-06. We find that this instruction properly states Michigan law regarding a manufacturer's duty to warn of nonobvious defects. See Miller v. Caterpillar Tractor Co., 697 F.2d 141, 146 (6th Cir. 1983); Weekes v. Michigan Chrome and Chemical Co., 352 F.2d 603, 606-07 (6th Cir. 1965). Further, we find that the alternative instructions offered by Massey and MJI would have added little to the jury's understanding of the law.
 
 
 43
 Massey and MJI argue that the district court erred in failing to grant their motion for mistrial based upon one remark of the trial judge in the presence of the jury and upon the participation of counsel for the United States in the jury trial prior to the court's ruling reserving the issue of the government's liability for the court. Based upon the entire record, we hold Massey and MJI's claims of error to be without merit.
 
 
 44
 Finally, Massey and MJI argue that the district court's award of costs in favor of the United States was an abuse of discretion. We find no abuse of discretion in the district court's ruling.
 
 
 45
 Accordingly, we AFFIRM the judgment of the district court.
 
 
 
 [1]
 An aerodynamic stall occurs when the air flow over the wing is disrupted, thereby destroying the lift necessary to sustain flight. The disruption of air flow over the wing is caused by the combination of two factors: the angle of attack, or the angle at which the wing meets the oncoming air, becomes too great, and the speed at which the wing meets the oncoming air becomes too slow. In wings-level, unaccelerated flight, as in this case, aerodynamic stall results in an almost instantaneous and marked loss of altitude
 
 
 [2]
 The shaker was activated at 94 knots, or approximately seven knots above the stall speed
 
 
 [3]
 The pusher was activated at 88 knots, or approximately one knot above the stall speed
 
 
 [4]
 Rule 54(d) provides:
 (d) Costs. Except when express provision therefor is made either in a statute of the United States or in these rules, costs shall be allowed as of course to the prevailing party unless the court otherwise directs; but costs against the United States, its officers, and agencies shall be imposed only to the extent permitted by law.
 (Emphasis added).
 
 
 [5]
 Rule 407 provides:
 When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment.
 Fed. R. Evid. 407. Michigan Rule of Evidence 407 is identical to the federal rule and the Michigan product liability statute, Mich. Comp. Laws Ann. Sec. 600.2946(3), has been held to be an attempt to 'clarify' Mich. R. Evid. 407. Downie v. Kent Products, Inc., 420 Mich. 197, 362 N.W.2d 605, 610-13 (1985). The Supreme Court clearly has attempted in that case and others to construe Mich. R. Evid. 407 consistently with Fed. R. Evid. 407. The district court relied on Mich. Comp. Laws Ann. Sec. 600.2946(3) and Rule 407 to exclude the AD.