R. A. Watson Orchards, Inc., Appellant, v. The New York, Chicago & St. Louis Railroad Company, Appellee.

Gen. No. 8,401.

Opinion filed November 4, 1931.

W. C. GREATHOUSE, A. F. BUSSARD, C. C. LEE and CRAIG & CRAIG, for appellant.

. CHARLES M. CONNOR and POPE & DRIEMEYER, for appellee; WALTER A. EVERSMAN, of counsel.

MR. JUSTICE ELDREDGE delivered the opinion of the court.

This case was originally brought in the circuit court of Coles county. Upon a trial in that county a verdict and judgment were rendered in favor of appellee. Upon appeal to this court that judgment was reversed and cause remanded. *Orchards v. New York, C. & St. L. R. Co.,* 250 Ill. App. 22. After the remanding order was issued the suit was dismissed in that county and recommenced in the county of Cumberland where upon a trial a similar verdict and judgment were rendered in favor of appellee. Both the pleadings and the evidence are somewhat different from what appeared in the former case. The declaration in the present case consists of but two counts, in the first of which it is averred in substance that the defendant was possessed of a certain railroad extending in an easterly and westerly direction along and near the south side of a cold storage plant of appellant at a distance of, to wit: 50 feet and operated divers locomotive engines upon said railroad; that it became and was, then and there, the duty of defendant to use reasonable care to keep and maintain said engines in suitable order and repair, and to so operate the same so that fire or sparks would not be liable to escape or be thrown therefrom to or upon property adjacent or near to the right of way; that said defendant notwithstanding its duty in that behalf wholly failed therein and did not use such reasonable care but while a certain locomotive engine of the defendant on the 10th day of October, 1925, at the hour of, to wit: 10:45 p. m. was passing along and upon said railroad in a westerly direction past the said cold storage plant, divers sparks and brands of fire then and there escaped and were thrown from said locomotive engine by and through said negligence and

carelessness of the defendant in and upon said cold storage plant and buildings of the plaintiff and said sparks and brands of fire then and there set fire to said storage plant and buildings and fire was thereby communicated thereto by said locomotive engine whereby said cold storage plant, buildings, appurtenances, apparatus, machinery, equipment, material, surplus equipment, cider and apples being of the value of, to wit: $275,000 were then and there consumed by said fire and wholly destroyed and lost to the plaintiff; that at the time of the fire plaintiff carried insurance on said real estate and contents of the cold storage plant to the extent of $79,500; that the total amount of insurance was paid to the plaintiff after the loss and thereby said insurance companies became subrogated to plaintiff's claim against defendant to recover for said loss by fire; that afterwards said insurance companies assigned their rights and causes of action against defendant to the plaintiff; that as to that portion of the loss amounting to $79,500 suit is brought by plaintiff as assignee and bona fide owner of said claims against said defendant of said insurance companies, and as to the remainder of the loss, suit is brought to recover for loss directly suffered by plaintiff and not covered by the insurance in the amount of $195,500.

The second count is identically the same as the first count with two exceptions. The date of the fire is fixed as of the 11th day of October, 1925, and the engine which caused the fire is alleged to have been one which passed along the tracks at 12:30 o'clock a. m.

A general description of the cold storage plant and its buildings and the location thereof with respect to the railroad tracks of appellee and of the Illinois Central R. R. Co. are set out in our former opinion and need not be repeated herein.

The first error brought to our attention is that the verdict is contrary to the manifest weight of the evi-

dence. The evidence in this case is not substantially different from that in the former case in regard to which we held that a jury could have found a verdict for either party to the suit and a further discussion of this question is unnecessary.

It is urged that the court erred in permitting proof of the results of experiments made by appellee's witnesses, Professor Young and Ralph Toensfeldt as to the inflammability of regranulated cork, there being no proof made that said experiments were made under substantially the same conditions that existed at the time of the fire. We held in our former opinion that testimony as to the inflammability or combustibility of cork and granulated cork and its action, subjected to fire or heat was competent testimony but we also held that the evidence of the experiments testified to by the witnesses in that case was incompetent because they were not made under the same conditions as existed at the time of the fire. On the trial of the present case, however, this objection was obviated. In introducing its evidence in chief appellant produced the witness Andrew Stiff who testified that he was superintendent of the plant of L. Mundet and Son, manufacturers of granulated cork at Hillside, New Jersey; that such cork runs from dust to a quarter of an inch and is the same kind of regranulated cork that Mundet and Son furnished for plants like appellant's and is used for insulation of such plants. He was then asked to tell from his experience the reaction of granulated cork to flame and when objection was made to the offered testimony counsel for appellant stated that this court held that testimony as to inflammability or combustibility of granulated cork is competent. The objection was overruled and the witness was permitted to state that "oftentimes there may be a piece of wire from the cork bales—sometimes a nail might get into it from the machinery working around there, and by this cork going through the finishing machine and un-

derneath the emery wheel and coming in contact with the emery wheel, it will throw sparks. These sparks drop in the cork around the machine and start a fire, probably not right away you won't see fire coming from it, it will probably be a half an hour or so. The spark will get into it and insulate it, it will keep on generating heat, finally you will see smoke coming where the sparks fell. . . . The cork will form around these sparks and forms a little ball. . . . That will keep on heating up and finally you will see some smoke coming from there. If you don't put it out and anything around there such as paper or bags or wood, you will have a flame. I have seen this thing occur in our plant in New Jersey." In answer to the question: "Did you ever have any experience with sparks?" the witness answered: "I have seen sparks come out of a smoke stack in our plant and light in this granulated cork. . . . The sparks come out of the stack and if the wind is blowing in the direction where we are sacking this granulated cork, it gets down around the granulated cork that is spread on the ground or bag is opened, and falls in one of the bags and starts to burn. No, it will not burn immediately, in a bag like that it will not start immediately. Probably it will be half an hour or an hour before you will see any fire. If it comes in contact with one of the sacks, or paper around, straw, any foreign materials, wood, then it will blaze, have a flame. . . . The spark from the stack gets into this granulated cork and it will start burning. . . . I have seen fire keep on burning after the cinder was all consumed. I have seen it burn there probably five or six feet in diameter. . . . it keeps on until it strikes some other material as I have described, then she goes up in flame. . . . I have seen it spread out, that keeps on heating up, getting hotter, and larger as it goes along. If there is a big pile of cork, would burn longer, smoulder away,

smaller quantity wouldn't burn so long. I have seen this cork flame when it would come in contact with wood, sacks, or paper. These instances I have told about, the sparks would land in the granulated cork, and the fire started from that spark lighting in the granulated cork.''

To rebut the above testimony the witness Young was placed on the stand by appellee. Professor Young had been connected with Purdue University for over 30 years and at the time he gave his testimony was head of the school and in charge of the work in the mechanical engineering department, and after testifying that he was familiar with various materials used for insulation and that cork was used because it provided good insulation and had the ability to resist the flow of heat either way through it, was asked the question: ''Will cork, either regranulated or cork board, support combustion without the continuous application of external heat?'' Counsel for appellant objected to this question and the objection was overruled. The witness answered. ''Granulated cork will not support combustion of its own ability.'' The witness did not attempt to testify to any experiments of any kind but simply as an expert to the scientific fact that granulated cork will not support combustion of its own ability.

The witness Toensfeldt was a consulting engineer and had been employed by the American Telephone and Telegraph Company and by the City of St. Louis as chief electrical engineer of the Department of Public Utilities; had a great deal to do with cork in various uses and purposes; had built a refrigerating plant all insulated with cork. He testified that he knew whether cork was combustible and that regranulated cork is a fire retarder, that it will burn under conditions of a continuous application of external heat but when the external heat is removed the cork will not continue to

burn. He further testified that he had made experiments with regranulated cork and was asked the question: ''Have you put cinders in them?'' To this question appellant objected and the court announced that this testimony was admitted on the same theory that the testimony was admitted on behalf of the plaintiff, and overruled the objection. The witness's answer to the question was: ''Yes.'' The witness further testified that he had observed the effect on cork when heated cinders were put into it and that he had heated cinders to a temperature of approximately 2,800 degrees and that the cinder when dropped into the cork ignited a small area immediately surrounding; that the cinder continued to burn for a while, gradually got cooler and finally went out leaving a crust of cork that had been in immediate contact with it but didn't communicate it to the rest of the cork. The above evidence was also objected to by appellant and the objection overruled. Appellant having persuaded the court to admit testimony in regard to the combustibility of cork with much greater latitude on the part of appellant is not in position now to object to similar testimony on the part of appellee in rebuttal.

Appellant also complains that the court admitted evidence in regard to the character of the netting used on the engines of appellee for arresting sparks. The evidence of these witnesses showed that appellee's engines were equipped with a device known as the Master Mechanics Standard front end which was developed at Purdue University in conjunction with the American Railway Association and adopted in 1906 as standard and since then has been in general use in the United States, Canada and Europe. The evidence of these witnesses tends to show that in addition to the above type of netting there is another type generally known as ''Draftac.'' They testified as to the difference between the two types and to their ex-

periences and observation of the results obtained from actual use of both types of netting. We can see no objection to this testimony. The only way of acquiring knowledge of the efficiency of a spark arresting device is by testing the same and this was recognized in the case of *Illinois Cent. R. Co. v. Bailey*, 222 Ill. 480, wherein it was said: "The defendant was not required by the law to purchase or adopt every new invention to prevent the escape of fire which might be in the nature of an experiment, but it was bound to exercise the highest degree of diligence in equipping its engines with the best and most approved appliance which had been proved by actual test."

Appellant objected to the admission in evidence of certain exhibits offered by appellee, being pages from the books containing the records of the inspections of the front ends of locomotives No. 888 and No. 909. Witnesses had already testified as to such inspections and the objection was that as they had already testified in regard thereto, that the admission of the records of such inspections would be simply incumbering the record. The court might have sustained the objection on the ground stated but its failing to do so was not error. The court admitted in evidence certain exhibits offered by appellee being the train dispatcher's train sheets for October 10 and 11, 1925, which tended to show that no train of appellee passed through the Town of Neoga between 12 o'clock p. m. October 10 and 1:30 o'clock a. m. October 11. Also the train dispatcher's train sheet of the Illinois Central R. Co. for the same period of time was introduced. The objection urged is that the train sheets were incompetent because they were made up from reports from operators at 13 or 14 different stations and the train dispatchers had no direct knowledge of the truth of the entries. We believe that this contention of appellant is opposed to the great weight of authority pre-

vailing in this country. In the case of *Hitchner Wall Paper Co. v. Pennsylvania R. Co.*, 158 Fed. 1011, in passing upon the competency of such evidence, it was held: "The objection is that the evidence is not competent, because the information which he recorded on his train sheet was supplied to him by somebody else, and it was not written there by reason of any knowledge which he had in regard to it, other than the reported information from others. The train dispatcher, in the modern conduct of a railroad, has a certain division of track over which he has a certain supervision and from various points of which he receives telegraphic communication as to the whereabouts of every train running on his section. Upon the accuracy of this information depends the safe conduct of the road, and the lives of hundreds of people depend upon the care with which this information is communicated, received and utilized by the dispatcher in charge of the division. There is every inducement for each person taking part in the accumulation of this information to be sure of its accuracy, and the dispatcher recording it has every incentive to be certain that he is receiving correct information and making an accurate record of that received. He has telegraphic communication along his whole section and receives dispatches from different persons at different points as to the exact whereabouts of each train to or from his central point. This, to some extent, provides him with a method of checking up the accuracy of the information received, and, as has been said, this information received from these train experts along the line of a well-conducted railroad is certainly as reliable as reports made of salesmen, draymen, porters and wharfingers to bookkeepers, who make original entries, which are afterward introduced in evidence as books of original entries and admitted as competent evidence. (*Louisville & Nashville R. R. Co. v. Daniel*, 91 S. W.

691, 28 Ky. Law Rep. 1146, 3 L. R. A. (N. S.) 1190; *Insurance Co. v. Railroad,* 138 N. C. 42, 50 S. E. 452).''

The same rule was announced in the case of *Chesapeake & Ohio Ry. Co. v. Stojanowski,* 191 Fed. 720: ''The safe operation of the railroad depended upon the accuracy of the train sheets. Every interest demanded that the entries should be accurate and there was every incentive to employes to make them so.''

In the case of *Currie v. Davis,* 130 S. C. 408, it was said:

''We know of no class of records made in 'the regular course of duties or business' which are more convincingly verified by the circumstances under which they are made, and the character of the entries themselves.''

This same doctrine was followed in *Donovan v. Boston & Maine R. R.,* 158 Mass. 450; *French v. Virginian R. Co.,* 121 Va. 383; Wigmore on Evidence, section 1530; and by analogy the same principle is held in *Harts v. Chicago & Alton R. Co.,* 184 Ill. App. 123 and *Kenna v. Calumet, H. & S. R. Co.,* 206 Ill. App. 17.

Some other objections are made to the admission of evidence which, without discussing the same, in our opinion are without merit.

The criticisms to the instructions given in behalf of appellee cannot be sustained except as to the fifth instruction which is as follows:

''And if you believe from a preponderance of the evidence in this case that defendant's locomotives in question were equipped with the best and most approved spark arresting devices and that at the time in question they were in good order and repair and that the said locomotives were carefully managed by competent servants, then the Court instructs you that the plaintiffs would not be entitled to recover any damages in this case and you should find the defendant, railroad company, not guilty, even though you may be-

lieve that a spark from a locomotive engine of defendant caused the fire.''

The second count in the declaration charged that the fire was set by sparks emitting from an engine which passed through Neoga at 12:30 a. m. October 11. There was no evidence as to the condition of the spark arresters on any engine that passed through Neoga at that time but counsel for appellee attempt to justify this instruction on the ground that the evidence conclusively shows by the train dispatcher's sheets that no such engine passed through Neoga at that time, therefore no evidence could be introduced in regard to any spark arrester on such an engine. While the train dispatcher's sheets were competent evidence it cannot be held that they were absolutely conclusive. The witness Stewart who testified on behalf of appellant stated that it was close to 12:30 a. m. when he saw an engine passing the warehouse in question emitting sparks. The witness Wildman testified that he was a conductor on the Illinois Central R. R. and on the night of October 10 he arrived at Neoga about 11:40 p. m. with his train which train was stopped for the interlocker at the crossing of the two roads because a train of appellee was using the crossing and that he saw the train on the Nickel Plate track and that his best recollection was that it was about 12:20 to 12:30 a. m. October 11. Appellant had a right to have this evidence considered by the jury notwithstanding that the train dispatcher's sheets and the evidence of the tower man tended to show that no train passed over appellee's tracks at 12:30 a. m. This instruction directs a verdict and tells the jury they should find appellee not guilty if they believe from the evidence that defendant's locomotives in question were equipped with the best or most approved spark arresting devices and should have been limited to those engines which the evidence showed

passed the warehouse on appellee's tracks prior to 12:30 a. m. and should not have directed a verdict. As the question whether an engine was operated on said tracks at about 12:30 a. m. on that night was a material and vital question of fact in the case and as the instruction ignored such an engine it was erroneous and the giving of it reversible error.

The judgment of the circuit court is reversed and the cause remanded.

We granted a petition for rehearing in this case and have again fully considered the points raised therein. The main contention of appellee is that the evidence so conclusively shows that no engines passed over its track at the time in question, that the giving of the fifth instruction was harmless error. To this we cannot agree. To so hold would be in effect eliminating the evidence introduced by appellant in regard thereto. We held, on the former appeal of this case, that the evidence was such that would sustain a verdict for either party, and such being the case, the giving of the fifth instruction on behalf of appellee is reversible error and we must adhere to our former opinion, which is refiled herein.

The judgment of the circuit court is reversed and the cause remanded.

*Reversed and remanded.*