[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 170 
This is an appeal from a judgment entered upon a jury verdict for plaintiffs and against Alabama Power Company in the amount of $3.5 million. We affirm.
The case is an outgrowth of a boating accident which occurred on Dog River, at the entrance to Halls Mill Creek, a navigable waterway in Mobile County, Alabama, on May 6, 1979. At that time and place, David Williams was operating a 1975 O'Day 25-foot sailing vessel, manufactured and sold by Bangor Punta Corporation (Bangor Punta), and subsequently purchased second-hand by Williams. Williams's wife, Jeri, and his daughter, Jennifer, were passengers. As the vessel was proceeding, its mast, which measured 33 feet, 8 inches above water level, came into contact with the standard 7,200-volt electric distribution line maintained by Alabama Power Company (APCo) and suspended across Halls Mill Creek. The ensuing electrical shock killed both Mr. and Mrs. Williams and injured their daughter, Jennifer.
On July 20, 1979, the administrators of the estates of Mr. and Mrs. Williams and the guardians of their surviving minor children, Jennifer, Pamela, and Lori, filed individual lawsuits, which were consolidated in state court under28 U.S.C. § 1333,[1] pursuant to the admiralty jurisdiction of the United States, claiming damages for the deaths of Mr. and Mrs. Williams and for the personal injuries sustained by Jennifer. The first count claimed compensatory damages on behalf of the administrators and the minor children for the death of David Williams proximately caused by the negligence of APCo. The second count claimed punitive damages under the wrongful death statute. The third count claimed compensatory damages on behalf of Jennifer Williams.
APCo by answer denied any culpability. APCo also filed a third-party complaint against the United States[2] seeking indemnity and contribution because of alleged misrepresentations by its representative, the Corps of Engineers, United States Army, which it claimed were the efficient cause of the accident. It also filed a third-party complaint against the Corps of Engineers and the National Oceanic and Atmospheric *Page 171 
Administration of the Department of Commerce, alleging their negligent failure to cause charts of the water area to depict the subject power line to be the efficient cause of the accident.
The United States appealed, seeking removal of the cause to federal court. Removal ensued; however, the cause was subsequently remanded to state court following a dismissal of the United States as a party. Following this remand, APCo moved to name Marine Builders, Inc. (Marine Builders), and Bangor Punta as third-party defendants. This motion was granted, whereupon APCo filed its third-party complaint against Bangor Punta and Marine Builders. In its claim seeking indemnity and contribution from Bangor Punta, APCo maintained that the Williams sailing vessel was defective and unreasonably dangerous because it was not grounded. APCo also charged that Bangor Punta should have warned the ultimate consumer of sailboat electrocution accidents of which it had prior knowledge, and of the dangers attendant to aluminum mast contact with overhead power cables. As against Marine Builders, APCo alleged that it was negligent and wanton in moving its newly constructed shrimp trawlers from their construction site down Halls Mill Creek so as to have their masts repeatedly collide with APCo's distribution line. This, according to APCo, entitled it to indemnity and contribution if APCo was found to be liable to plaintiffs.
Upon APCo's motion, the trial court dismissed the plaintiffs' claims under Alabama's wrongful death statute, thus effectively deciding that the case would proceed exclusively under admiralty jurisdiction and substantive law. See Kennedy EngineCompany v. Dog River Marina and Boatworks, 432 So.2d 1214 (Ala. 1983). A later amendment by APCo to its third-party complaint was stricken on motion. Following trial, the jury returned five separate verdicts for the plaintiffs against APCo in the aggregate sum of $3.5 million. The jury also found in favor of the third-party defendants, Bangor Punta and Marine Builders. APCo's motions for judgment notwithstanding the verdict, new trial, or remittitur, partially including grounds relating to its third-party claims, were denied. APCo paid the judgments and took this appeal from the judgments in favor of Marine Builders and Bangor Punta. The issues raised will be treatedseriatim.
 I. Whether the trial court erred in excluding from evidence asailboat "mast warning."
This issue pertains to a "mast warning" sticker which, beginning with the 1976 model of the O'Day 25-foot sailboat, Bangor Punta placed upon each boat it manufactured. This sticker contained language warning that contact with overhead power lines was dangerous, and restated the warning found in the operating and rigging instructions furnished with the vessel. This "mast warning" was not affixed to the 1975 model of the Williams sailboat, but, as stated above, was placed on later models. During the trial, APCo's attempts to introduce evidence of this warning were excluded on objection. The trial court also excluded evidence included in answers to interrogatories by and in the deposition of James H. Hunt, Bangor Punta's president, pertaining to such warnings.
APCo acknowledges in brief that the "mast warning" was first introduced after the 1975 sailboat of the Williamses had been sold by Bangor Punta and left its possession. APCo maintains that this evidence was, nevertheless, relevant on the issue of Bangor Punta's negligence, because the "mast warning" came into existence some three years before the accident. It is apparent that the trial court's refusal to admit this evidence was based upon its conclusion that it constituted an inadmissible subsequent remedial measure.
That rule, of course "is designed to protect the important policy of encouraging defendants to repair and improve their products and premises without the fear that such actions will be used later against *Page 172 
them in a lawsuit." Werner v. Upjohn Company, 628 F.2d 848, 855
(4th Cir. 1980). To be sure, federal cases, under Federal Rule of Evidence 407, allow the introduction of subsequent remedial measures to prove the feasibility of such remedial measures,but only when feasibility is controverted. Werner at 853. That position is also followed by Alabama case law, which followsWerner. In Standridge v. Alabama Power Co., 418 So.2d 84 (Ala. 1982), this Court stated:
 "There are several exceptions to the general rule of inadmissibility of evidence of subsequent repairs or remedial measures. A party may introduce such evidence to show the existence of a condition at the time of an accident; Dixie Electric Co. v. Maggio, 294 Ala. 411, 318 So.2d 274 (1975); to show the feasibility of the use of safeguards or precautionary measures; Werner v. Upjohn Co., 628 F.2d 848 (4th Cir. 1980); to impeach a witness, Norwood Clinic, Inc. v. Spann, 240 Ala. 427, 199 So. 840 (1941); or to give testimony which is part of the res gestae.
 "Alabama Power acknowledges another exception, that evidence of subsequent repairs may be admitted for the limited purpose of showing a party's control of the alleged defective premises or instrumentality. Norwood Clinic, Inc. v. Spann, 240 Ala. 427, 199 So. 840 (1941); Gulf Railroad Co. v. Havard, 217 Ala. 639, 117 So. 223 (1928). Nevertheless, in order for evidence to be admissible to establish control, control must be a controverted issue in the case. Werner v. Upjohn Co., 628 F.2d 848 (4th Cir. 1980); Gulf Railroad Co. v. Havard, 217 Ala. 639, 117 So. 223 (1928). Alabama Power's major contention was that it had no duty to Mr. Standridge, not that it had no control over the premises. The estate asserts that the evidence of subsequent remedies is admissible to establish the company's duty to Mr. Standridge. We cannot agree. Duty is an essential element of a cause of action for negligence. The issue of duty does not fall outside the general rule that evidence of subsequent remedial measures is inadmissible to prove a party's negligence. Thus, the trial judge properly excluded evidence of any subsequent remedies provided by Alabama Power." 418 So.2d at 88-89.
The same reasoning applies here. The exception to establish the feasibility of a "mast warning" was never controverted at trial by Bangor Punta; indeed, feasibility was conceded by it in its motion in limine filed before trial. For aught that appears, APCo's purpose in introducing such evidence was to show Bangor Punta's negligence in the first instance, i.e., in selling the sailboat without that warning, and not to controvert at trial the feasibility of such a warning.
APCo, however, argues that the absence of the "mast warning" was nevertheless admissible because Bangor Punta had knowledge of the danger of electrical shock from possible contact with lower power lines before this accident took place. In other words, APCo would have this evidence admitted against Bangor Punta, even though Bangor Punta's control over the sailboat had long since ceased, so long as Bangor Punta had knowledge of the danger before the accident. Alabama cases have focused on post-accident remedial changes to premises, facilities, or articles under the defendant's control which proximately causes injury. See Standridge, supra; Dixie Electric Co. v. Maggio,294 Ala. 411, 318 So.2d 274 (1975). Thus, had Bangor Punta controlled the sailboat in question at the time the "mast warnings" were placed upon 1976 models, perhaps an issue of negligence would have been made by its failure to incorporate that change in the 1975 model.[3] But, as the Fifth Circuit Court of Appeals has commented on the subject of subsequent remedial measures in a products liability case, Grenada SteelIndustries, Inc. v. Alabama Oxygen Co., 695 F.2d 883, 888 (5th Cir. 1983): *Page 173 
 "Instead, we ought to consider the probative value of such evidence on the point at issue. The real question is whether the product or its design was defective at the time the product was sold. See S. Saltzburg K. Redden, Federal Rules of Evidence Manual 181 (3d Ed. 1982). The jury's attention should be directed to whether the product was reasonably safe at the time it was manufactured. . . . The introduction of evidence about subsequent changes in the product or its design threatens to confuse the jury by diverting its attention from whether the product was defective at the relevant time to what was done later. . . . Interpreted to require the evidence to focus on the time when the product was sold, Rule 407 would conform to the policy expressed in Rule 403, the exclusion involving information if its probative value is substantially outweighed by the danger of confusion. . . ." (Emphasis added.)
See also Casrell v. Altec Industries, Inc., 335 So.2d 128 (Ala. 1976) (to establish liability in a products liability case, plaintiff must show that he suffered injury by one who sold a product in a defective condition); and First National Bank ofMobile v. Cessna Aircraft Co., 365 So.2d 966 (Ala. 1978) (the manufacturer's liability arises because he has placed the product on the market and having done so, if he still retains some measure of control, no sale having taken place, he should be liable).
A question on the relevancy of testimony is ordinarily a matter within the trial judge's discretion, and his ruling thereon will not be considered error on appeal unless that discretion has been grossly abused. Costarides v. Miller,374 So.2d 1335 (Ala. 1979). See also Burbic Contracting Co. v.Cement Asbestos Products Co., 409 So.2d 1 (Ala. 1982) (exclusion of post-manufacture improvement in product line is not abuse of trial court's discretion). In this instance, that discretion was not abused.
 II. Whether the trial court erred in allowing Bangor Punta tointroduce evidence of another boating accident, together withphotographs pertaining to that accident, and in later rejectingAPCo's evidence consisting of photographs of the other boat, inrebuttal.
One of the facts adduced at trial pertaining to the manufacture of the Williams sailboat was that it was not equipped with a lightning protection grounding system. It was APCo's position at trial that the presence of a grounding system on this boat would have greatly enhanced the Wiliamses' chances of surviving the electrical shock from contact with the power line. In support of this position, APCo presented the expert testimony of Dr. Norbert Schmitz. This witness conceded that a number of metallic alterations had been made to the sailboat by Mr. Williams after he purchased it (and after it had left Bangor Punta). These included an outboard motor on the stern, a metal gas can under the back seat, a metal steering wheel connected down to the rudder, and a metal throttle to the outboard motor. Dr. Schmitz testified that all of these would be required to be bonded to a grounding, or bonding, system with the aluminum mast in order to have lightning protection, and that had they been grounded together, the Williamses would have been "like birds on a power line," and would not have sustained such serious injuries. Dr. Schmitz also testified that without the additional bonding of the added items and with a factory-installed bonding system otherwise, with the voltage encountered, "there would have been sufficient [voltage] to have caused that kind of an injury, but it is not always a direct consequence of contact. . . . It's in a grey area which we simply don't know." His testimony followed:
 "Q. Dr. Schmitz, the purposes of this bonding system that you've demonstrated and that you're talking about, doesn't make any differences in terms of the electrical principles involved whether that boat had an outboard or an inboard *Page 174 
as long as it is all bonded together, all the metal masses bonded back together?
"A. No, sir.
 "Q. So, you're telling the jury that a sailboat, whether inboard or outboard, that has all of the metallic masses and the mast and the stays and the shrouds, all the metal parts whether it's inboard or outboard, are you telling the jury that a person on such a boat who strikes a 7,200 volt line would be like a bird on the line and walk away from the accident; is that correct?
"A. With the groundplate down?
 "Q. Yes, with the grounding system as you have discussed and described.
 "A. What I'm saying is is that in my opinion he would not have been killed. His chances of survival in walking away from that accident would be excellent."
In rebuttal of this testimony, Bangor Punta called Mr. Joe Kuncl. This witness testified to an accident he experienced in July 1967 when the mast of his sailboat came in contact with a 12,500-volt power line[4] on the Fon du Lac River near Fon du Lac, Wisconsin. Kuncl was operating a 25-foot New Horizons sailboat equipped with an inboard engine, when he reached for the metal reverse gear, and at that time the boat's mast contacted the power line, severely burning him about the body and head. Kuncl's sailboat was equipped with a lightning protection grounding system. Bangor Punta also produced Mr. Edward Grogan, who witnessed Kuncl's accident and described Kuncl's serious injuries. A photograph of Kuncl showing his severe injuries was also introduced by Bangor Punta.
APCo attacks the relevancy of this testimony as having no logical relationship to the issues, as being "too remote," as confusing to the jury, and as res inter alios acta. None of these objections is valid here, however. As evidence offered in rebuttal of Dr. Schmitz's opinion, it was clearly relevant. Dr. Schmitz's opinion was to the effect that the presence of a lightning grounding system on any sailboat would allow a person on that boat to have been "like a bird on a power line," without serious injury if the boat's mast struck a 7,200-volt power line. Thus, his testimony encompassed the entire field of possible serious injury from such a general condition, and thus it was proper rebuttal evidence to show, contrary to Dr. Schmitz's opinion, that serious injury could in fact result from such a condition. When evidence is offered for the purpose of establishing the impossibility of some point, it is proper rebuttal to show the possibility of that which the opponent claims is impossible. Cf. Watson Orchards v. New York CentralRy., 263 Ill. App. 397 (1931); Comment, 34 Ill.L.Rev. 210-11 (1939). Thus, when Dr. Schmitz's opinion was introduced showing the impossibility of serious injury or death on any sailboat equipped with grounding, it was allowable to rebut his opinion with real evidence of such an injury in a sailboat so equipped which struck a similar power line. Sims v. Callahan, 269 Ala. 216, 112 So.2d 776 (1959). The admission of such evidence was within the discretion of the trial court, Gulf Refining Co. v.First National Bank of Mobile, 270 Ala. 351, 119 So.2d 1
(1960); Raines v. Williams, 397 So.2d 86 (Ala. 1981), and, contrary to APCo's contention, was directed to a material issue, i.e., the effect of a lightning grounding system. SeeCherry v. Hill, 283 Ala. 74, 214 So.2d 427 (1968). The objection of remoteness was not made at trial; even so, such a question is likewise addressed largely to the trial court's discretion, subject to disturbance only for gross abuse, not present here. Ryan v. Acuff, 435 So.2d 1244 (Ala. 1983). The objection of res inter alios acta is also addressed to relevancy. Loftin's Rent-All, Inc. v. Universal PetroleumServices, Inc., 344 So.2d 781 (Ala.Civ.App. 1977).
We reach the same conclusion concerning the photograph displaying Mr. *Page 175 
Kuncl's injuries. This case concerns the possibility of incurring serious burns and death caused by electricity. The photograph of Kuncl discloses serious burns incurred under conditions substantially similar to those which the Williamses experienced. The fact that the photograph partook of that character did not make it irrelevant.
 "A photograph that enables the court or jury to have a better understanding of a person, place, objection or conditions is generally relevant and admissible for the purpose of explaining and applying the evidence."
The photograph here met those requirements and thus its admission into evidence was not error. Thompson v. Magic CityTrucking Service, 275 Ala. 291, 154 So.2d 306 (1963).
Nor was it error for the trial court to disallow the introduction of certain other photographs into evidence. According to Dr. Schmitz's testimony, these were enlargements of smaller photographs which had been shown to him by someone else, and identified by that other person as photographs of Kuncl's sailboat. Dr. Schmitz himself had not seen the Kuncl sailboat itself and thus could not testify to the authenticity of the photographs as accurate reproductions of the object they displayed, having no actual knowledge of it. Smith v.Claybrook, 349 So.2d 1087 (Ala. 1977). The proper predicate not having been laid, the trial court correctly excluded the photograph.
 III. Whether the trial court erred in giving Bangor Punta's jurycharge No. 4.
That instruction follows:
 "The Court charges the jury that any failure of Bangor Punta Corporation to adhere to recommended practices concerning lightning protection is not to be considered as evidence that the sailboat designed, manufactured and sold by Bangor Punta Corporation was defective and unreasonably dangerous with respect to contact with overhead power lines."
In that connection, the trial court also gave as part of its oral charge the following:
 "Now, there has been introduced into evidence certain recommendations or standards or codes which you've heard the lawyers refer to many times which is in evidence. The Court has allowed these recommendations, regulations or codes and standards to be admitted as going to show a standard of care or a recommended standard of care and has allowed them to be admitted on the issue of evidence as to whether or not there was negligence on the part of Bangor Punta. The Court, however, cautions you that by the Court allowing these codes, standards or recommendations to be admitted that they are not to be considered as codes, standards and recommendations that are absolute in themselves, but you may consider them merely as guidelines as to recommended conduct. Further they are to be considered along with all of the other facts and evidence that is adduced in this case."
The evidence referred to in these charges pertained first to the testimony of plaintiff's witness, Dr. Schmitz, through whom a copy of Volume 7 of a publication entitled "The National Fire Code" was introduced. Dr. Schmitz testified that that publication had been approved by the American National Standards Institute and contained provisions regarding the installation of grounding systems for cruising sailboats. Dr. Schmitz conceded that he did not know of any manufacturer who followed these standards, and also conceded that the provisions therein pertaining to grounding against lightning made no reference to protection from overhead power lines. We take note that the National Fire Code provisions themselves are "documents which have been judged [by their authors] suitable for legal adoption and enforcement." Indeed, Dr. Schmitz qualified his own testimony relative to their adherence by the boating industry at large: *Page 176 
 "Q. So, it's your statement not being a member of the National Fire Protection Association that this lightning protection Code as is called for, recommended practices, is industry standard and not from your information or study of the industry itself as adhering to any of these recommended practices?
 "A. I know of manufacturers who put lightning grounds and bonding systems on sailboats of the size and type that we have under consideration, but do not recall specific instances in which these boats are equipped solely with outboard power.
 "Q. This lightning protection code is not any statute, is it?
 "A. No, it could be made a statute in much the same manner as other portions of the NFPA, are introduced in municipal ordinances.
"Q. But it's not, is it?
 "A. Not to my knowledge, but I have not studied the statutes of every community or segment of the —
"Q. In this community in this state?
"A. I don't know.
 "Q. It is solely your interpretation of that Code lightning protection code that it does apply to contact with overhead power lines, is that correct, even though you are not a member of the NFPA?
"A. Yes."
Over defendant's objections, the trial court allowed this document into evidence, as well as a copy of "Safety Standards for Small Craft" and "Standards of the American Boat and Yacht Council." The trial judge at that time, as well as later when he charged the jury, announced that these publications would be admitted for whatever weight the jury would give to them.
This Court has examined each of the documents. Each publication is a recommended practice and standard for guidance, and is not shown to have been adopted by the sailboat industry itself. Moreover, none of the recommendations for the arrest of lightning referred to such a practice as a protection from contact with an overhead power line. Dr. Schmitz himself knew of no publication making grounding on sailboats protection from contact with overhead power lines or of any industry adoption of the recommendations in the proposed standards:
 "Q. Are you aware of any manufacturer in the sailboat industry who grounds outboard sailboats with lightning mitigation equipment that you are talking about as a standard or code, any manufacturer in the industry?
 "A. No, I simply don't survey the industry to determine this sort of thing.
 "Q. So you cannot talk about whether the industry has followed these recommendations whatsoever, can you?
 "A. I would have to go to every boatyard that builds a sailboat that could be equipped with an outboard motor to answer that question.
"Q. And you — well, you haven't have you?
"A. No.
 "Q. So therefore you do not know any manufacturer that follows these standards you are talking about, the twenty-six foot outboard sailboat or under or less?
"A. No.
 "Q. Is there any reference whatsoever in this lightning protection code that you referred to protection, specific protection, from overhead power lines?
"A. No."
In rebuttal, Bangor Punta's president, Mr. Hunt, who had served as a member of the board of directors of the American Boat and Yacht Council (ABYC), testified that such recommendations were not related to contact with overhead power lines. Mr. Gorham Lippman, the executive director of the ABYC, called by Bangor Punta, testified likewise, and added:
 "A. All ABYC standards are voluntary standards as that is laid out in our constituted purpose. And I believe that that would state that this standard is certainly only a voluntary standard recommending that if you put a lightning protection aboard a boat, here is the way to do it." *Page 177 
Several Alabama cases have dealt with the admissibility of safety regulations published by federal agencies under the authority of Congress. In City of Dothan v. Hardy, 237 Ala. 603,188 So. 264 (1939), this Court approved the admissibility of certain portions of the "Handbook of the Bureau of Standards, No. 10" dealing with "Safety Rules for the Installation and Maintenance of Electrical Supply and Communication Lines," but admonished that such rules, though admissible as expert opinion evidence (to be considered by the jury), were not regulations having the force of law whose violation was negligence per se. To the same effect is Knightv. Burns, Kirkley Williams Construction Co., 331 So.2d 651,654 (Ala. 1976), which held that certain safety requirements enacted within the terms of the Occupational Safety and Health Act and its regulations were admissible "for a jury to consider in determining the standard of care that a defendant should have followed." See also Meadows v. Coca-Cola Bottling, Inc.,392 So.2d 825 (Ala. 1981). We have been cited to no Alabama cases extending this principle to private proposals such as those admitted here, not governmental agency regulations adopted under governmental authority. Under the evidence, moreover, we cannot find that these recommendations were relevant to the inquiry, i.e., as protection from contact by a metal mast with an overhead power line; thus the trial court would not have been in error in excluding such evidence. However, APCo complains only that the trial judge erred in his instruction to the jury allowing them to consider this evidence along with other evidence on the issue of negligence. Thus, any error in admitting it was not prejudicial to APCo.
 VI. Whether the trial court erred to reversal in its oral chargeto the jury that actual knowledge of a defect was required inorder to impose liability upon Bangor Punta.
That portion of the trial court's lengthy instructions pertinent to this issue is as follows:
 "Relative to the negligence of Bangor Punta, the third party plaintiff, Alabama Power Company, in its claim against Bangor Punta for negligence must reasonably satisfy you by a preponderance of the evidence that the following facts or conditions combined and concurred to produce the damages claimed by the third party plaintiff, the Alabama Power Company. First, that the defendant, Bangor Punta, negligently designed, manufactured or assembled the sailboat in question. Two, that it could have been reasonably anticipated by the defendant, Bangor Punta, that said sailboat would become inherently or imminently dangerous to human life or health when put to its intended use, ordinary and customary use. Third, that the said sailboat became inherently or imminently dangerous to human life or health when it was put through its intended, ordinary and customary use and that the said negligence [of] the third party defendant, Bangor Punta proximately caused the injuries to the plaintiffs.
 "A manufacturer of a product which may be reasonably anticipated to be dangerous if defectively made owes a duty to exercise reasonable care in the manufacturing of his product so that it will be reasonably safe for its normal usage. Reasonable care means that degree of care that a reasonably prudent manufacturer of such a product would exercise in the designing, making and inspecting and testing of the product and the materials and parts of which it is made in order to produce a reasonable safe product. If you are reasonably satisfied from the evidence that the sailboat in question, which the third party plaintiffs, the Alabama Power Company, claimed proximately caused the injury and damage to the plaintiff was defective when put on the market by the third party defendant, Bangor Punta, that with such defect the sailboat could be reasonably anticipated to be dangerous when put to its ordinary and normal use, that the third party defendant, *Page 178 
Bangor Punta failed to use reasonable care in the designing or making of the sailboat or in inspecting or testing it for defects, or that, although the third party defendant, Bangor Punta, used reasonable care in designing, making, inspecting and testing the sailboat, Bangor Punta learned before it was placed on the market of the defect, your findings would be that the third party defendant, Bangor Punta, was negligent. On the other hand, if you are reasonably satisfied from the evidence that the sailboat in question was not defective when put on the market by the third party defendant, Bangor Punta, or that in its defective condition that the sailboat in question could not have been reasonably anticipated to be dangerous when put to its normal use, that the third party defendant, Bangor Punta, exercised reasonable care in the designing, making, inspecting and testing of the sailboat in question and had no knowledge when it was put on the market of any defect in it, your finding would be that the third party defendant, Bangor Punta, was not negligent."
Additionally, and at APCo's request, the trial court also gave the following charge:
 "The manufacturer of a sailboat which may be reasonably anticipated to be dangerous if used in a way which he should reasonably foresee it would be used is under a duty to exercise reasonable care to give reasonable and adequate warning of any dangers known to him, or which in the exercise of reasonable care he should have known and which the user of the product obviously could not discover. Reasonable care means that degree of care which a reasonably prudent person would exercise under the same circumstances."
APCo based its claim against Bangor Punta on the basis of active-passive negligence. In fact, the trial court gave APCo's requested jury charges authorizing one guilty of only passive negligence to recover by way of indemnification from a party guilty of active negligence (under admiralty law). The entire oral charge, taken as a whole, places liability upon Bangor Punta if it manufactured a product "which may be reasonably anticipated to be dangerous if defectively made" because the manufacturer "owes a duty to exercise reasonable care in the manufacturing of his product so that it will be reasonably safe for its normal usage." This aspect of the instruction accords with our doctrine of manufacturer's liability. Casrell v. AltecIndustries, Inc., 335 So.2d 128 (Ala. 1976). The later reference in the court's oral charge that "although the third party defendant, Bangor Punta, used reasonable care in designing, making, inspecting, and testing the sailboat, Bangor Punta learned before it placed on the market of the defect" did not prejudice APCo in view of the language of the charge as a whole, which placed liability upon Bangor Punta as earlier stated.
Thus, we find no reversible error in the trial court's instructions. Wright v. Rowland, 406 So.2d 830 (Ala. 1981);Cities Service Oil Co. v. Griffin, 357 So.2d 333 (Ala. 1978). If counsel had thought the entire charge misleading, he should have requested an explanatory instruction. Cf. Mobile CountyGas District, v. National Cash Register Co., 295 Ala. 188,326 So.2d 105 (1976); and McLemore v. Alabama Power Co., 289 Ala. 643, 270 So.2d 657 (1972).
 V. Whether the trial court erred in failing to charge the juryon the minimum clearance for the power line in question asestablished by the United States Corps of Engineers.
It is APCo's contention that the "minimum clearance standard" of the Corps of Engineers was "pertinent on the issue of the manufacturer's foreseeability of mast contact" and thus that it was error to refuse a jury instruction on that standard.
The necessity for a permit over navigable waters arises from33 U.S.C. § 403:
 "The creation of any obstruction not affirmatively authorized by Congress, to *Page 179 
the navigable capacity of any of the waters of the United States is prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army; and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of any port, roadstead, haven, harbor, canal, lake, harbor of refuge, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same."
The list of prohibited obstructions is not exclusive, UnitedStates v. Illinois Terminal R. Co., 501 F. Supp. 18 (E.D.Mo. 1980), but extends to "any type of obstruction." United Statesv. Republic Steel Corp., 362 U.S. 482, 80 S.Ct. 884,4 L.Ed.2d 903 (1960).
The evidence established that the Corps of Engineers of the United States Army was the regulatory agency responsible for issuing authorizations, or permits, for the installation of utility lines over navigable waters. The procedure incumbent in obtaining such a permit first required a minimum of 30.8 feet above maximum high (tide) water to apply for a permit. Nevertheless, officials of the Corps of Engineers testified that the elevation of the line over the water was governed by, and thus controlled by, the height or elevation expressed in the permit ultimately issued by the Corps, which in this case was 40 feet above mean low water. The evidence also established that this 40-foot elevation conformed to the original application for a permit submitted by APCo to the Corps of Engineers in 1936. This application was accompanied by a diagram of the proposed power line which proposed the location of the line as 40 feet above mean low water. Thus, while the minimum clearance standard of 30.8 feet was the minimum with which to support an application, it was the responsibility and within the authority of the Corps of Engineers to grant the final permit at a height deemed safe and feasible to the Corps.United States v. King Fisher Marine Service, 640 F.2d 522 (5th Cir. 1981) (permit issued by Corps of Engineers under 33 U.S.C. § 403
for dredging operations requires strict compliance). See also Zabel v. Tabb, 430 F.2d 199, 207 (5th Cir. 1970), cert. denied, 401 U.S. 910, 91 S.Ct. 873, 27 L.Ed.2d 808 (1971) (33 U.S.C. § 403 "is structured as a flat prohibition unless — the unless being the issuance of approval by the corps").
Additionally, it is shown by the evidence that the minimum clearance requirement was dropped from the Corps regulations prior to the time this sailboat was manufactured. Thus, such former minimum requirement should have had no relevance to the foreseeability of mast contact with this power line. Furthermore, although APCo also argues that the trial court refused to permit evidence of the 30.8-foot standard, the record reflects that both the application standard height and the permitted height were testified to in substantial detail; hence no error can be predicated upon any such alleged error.Sweatman v. Federal Deposit Ins. Corp., 418 So.2d 893 (Ala. 1982). Having so ruled, we need not consider whether the duty of APCo to maintain the power line at the 40-foot level has not already been decided by the jury when it found in favor of the plaintiffs.
 VI. Whether the trial court erred in failing to instruct the jurythat APCo could recover punitive damages from Bangor Punta andMarine Builders by way of indemnity and contribution.
APCo's argument here is that "the jury should have been instructed that APCo had a right to recover punitive damages from *Page 180 
Bangor Punta and Marine Builders, in the event the evidence warranted it."[5] We disagree.
At the conclusion of all the evidence, Bangor Punta and Marine Builders moved for a partial directed verdict in their favor on the issue of whether either was guilty of wanton misconduct. The trial court granted this motion. Subsequently, the trial court instructed the jury on the issue of punitive damages by way of indemnity and contribution:
 "Now indemnity and contribution only apply to compensatory damages. The Court instructs you that if your verdict against the Alabama Power Company includes compensatory damages and punitive damages, that the law prohibits you from rendering a verdict for indemnity or contribution on that aspect of your verdict which is for punitive damages."
APCo's argument fails for several reasons. For one thing, it does not point to any evidence of wanton misconduct on the part of either Marine Builders or Bangor Punta warranting an award of punitive damages against either or both, and our reading of the record reveals none. For another, it is clear that the law does not allow punitive damages, as opposed to compensatory damages, by way of contribution or indemnity. Addressing the same problems which arose in the context of a 42 U.S.C. § 1983
action, the court in Davidson v. Dixon, 386 F. Supp. 482 (1974), aff'd without opinion, 529 F.2d 511 (3d Cir. 1975), reasoned:
 "The preferable rule, in this Court's judgment, is that each defendant's conduct may be independently evaluated in assessing punitive damages and that separate awards for such damages may be made against different defendants. See e.g., Breeding v. Massey, 378 F.2d 171 (8th Cir. 1967); Ford Motor Credit Co. v. Hill, 245 F. Supp. 796 (W.D.Mo. 1965) and cases collected in Annotation at 20 A.L.R.3d 648 (1968). While the current record provides no basis for distinguishing between the culpability of the various defendants and thus provides no basis for punitive damage awards of different amounts, separate awards nevertheless seem desirable. Punitive damages are imposed for their effect on the defendant and others similarly situated; the benefit which the plaintiff receives is incidental and, in a sense, a windfall. . . . The policy which the imposition of punitive damages is meant to foster will be best served if separate awards for punitive damages are made against defendants. . . ."
To the same effect is Gagnon v. Ball, 696 F.2d 17 (2d Cir. 1982), concurred in by McFadden v. Sanchez, 710 F.2d 907 (2d Cir.N.Y. 1983). These authorities are persuasive that allowance of punitive damages awards in such claims as the present ones under federal law rests upon individual culpability rather than upon liability based merely upon contribution and indemnity.
Finally, we note that the jury did not award any compensatory damages against either Bangor Punta or Marine Builders. Thus, APCo did not recover under its claims that the sailboat's manufacture was defective and that Marine Builders' actions in moving its shrimp boats under the power line were negligent. The jury's having found in favor of these third-party defendants on the question of liability, the issue of punitive damages became moot.
 VII. Whether the trial court erred in disallowing evidence of theprice of Marine Builders' shrimp boats and of Marine Builders'net worth.
It appears from the record that the injection of the price of Marine Builders' shrimp *Page 181 
boats and Marine Builders' net worth occurred in the opening statement of APCo's attorney. That statement referred to Marine Builders' construction of "bigger" and "taller" shrimp boats (which were then sailed down Halls Mill Creek with "skids" on the masts to enable them to pass under APCo's power line). That statement continued:
 "And they demanded, `Okay, power company, you raise the line,' and the power company said, `Look, it is our policy that when people who are in the business need a line raised to accommodate them, they pay the cost for raising the line,' and they said to them, they said, `Do you want us to give you an estimate,' and they said, `No, they're not going to pay you a dime.'
 "So they wrote letters. They wrote the ADO. In the meantime, an impasse develops. Now let me — the evidence will also show — now we're talking about a quarter of a million dollar shrimp boats being produced one a month —
 "MR. SINTZ: Now, if the Court please, we object to that; any reference to how big the vessels or anything else has no place in this.
 "MR. ALLEN: It has much to do with whether it would be reasonable for these people to pay the cost of —
 "THE COURT: Let's proceed on what we expect the evidence to be in the case.
 "MR. SINTZ: If he would like me to mention the net worth of the Alabama Power Company, which has nothing to do with this lawsuit either."
Later, during APCo's cross-examination of Ed Horton, one of the owners of Marine Builders, the following took place:
 "Q. . . . At the time the power company quoted you a figure of ten thousand dollars or thereabouts to raise this line, how many boats per year were you producing in the shipyard?
"A. Approximately twelve.
"Q. About one a month?
"A. It would vary.
"Q. But approximately twelve a year.
"A. That's correct.
 "Q. What was the average sales price of those boats?
"MR. SINTZ: Your Honor —
"MR. CROWDER: Your Honor, that would be immaterial.
"MR. SINTZ: Totally irrelevant. We object.
"THE COURT: I sustain the objection."
Later in the trial, the attorney for plaintiffs called Mr. Ray Horton, vice-president of Marine Builders, as an adverse witness, and during his testimony on direct examination, he referred to his company's difficulties with APCo's low power lines and its repeated concerns about the safety of its men and others. He added:
 "Q. Did you ever get a positive response to the inquiries and complaints you made?
 "A. The only one I can remember is them saying that we would have to pay to raise them.
 "Q. And who was it that told you, you would have to pay to raise the lines?
 "A. I don't remember. We got a letter from the power company.
"Q. Have you looked for that letter?
"A. Yes.
 "Q. And have you been able, or not been able to find it?
"A. No.
 "Q. Do you remember the amount that they told you you would have to pay to raise their power line?
"A. $10,000.00.
 "Q. And what did you tell them when they told you you would have to pay $10,000.00 to raise their power line?
"A. Well, at the time, we couldn't afford it.
 "Q. And did you tell them you weren't going to pay it?
 "A. Told them we couldn't pay it. We didn't think it was our place to pay it.
 "Q. Now, you in addition, and your brother Ed who testified earlier, would go out on some of the boats that went out of the creek, is that true? *Page 182 
"A. That's true.
 "Q. He told us he went about fifty percent of the time. Were you the fellow that went the other fifty percent of the time?
"A. That's right.
 "Q. And did you have occasion during the course of the time that you were taking these boats out to observe those wires and the condition of the wires?
"A. Constantly.
 "Q. Were the wires, the wires were hung crossways on crossbars, weren't they?
"A. Yes.
 "Q. Were all the wires hanging at the same level during the period of time, let's say, in 1976?
"A. To the best of my knowledge, they were.
 "Q. And when you would go under there and when the conditions were such that the tide was up and it was in warm weather, is that when you had your skids come in contact occasionally with the wires?
 "A. Yes, the skids always went above the mast about this far (indicating). We didn't get right down on top of the mast. We always kept it up. And when it did make contact, it would just touch it, but then the wires would sag like that (indicating), and sometimes they would touch together way out in the middle."
We have referred to the financial condition of Marine Builders vis-a-vis the power line, as disclosed in the record, to show that the subject was first broached on cross-examination of a witness by APCo itself, and later by plaintiffs in cross-examination, not by Marine Builders. In Ray Horton's later testimony, APCo attempted to have him disclose the net worth of Marine Builders and the sales prices of their shrimp boats, but objection to this was sustained.
The obvious purpose of this line of questioning was to show that Marine Builders had the financial ability to raise the power line. This issue has been mooted by the jury's verdict for plaintiffs and in favor of Marine Builders and Bangor Punta on APCo's claims against them for negligence. The jury implicitly found that it was APCo's duty to maintain the lines at a 40-foot level and that it failed in this duty, and that its failure proximately resulted in the deaths and injuries. The jury's findings exonerating Marine Builders implicitly found that Marine Builders owed no duty to raise the lines. Thus, any evidence disclosing that Marine Builders had the financial ability to raise the lines was irrelevant if Marine Builders had no duty to do so.
Moreover, by arguing that the financial condition of Marine Builders was admissible by APCo to rebut evidence offered by Marine Builders, APCo, we respectfully suggest, has misconceived the order of the evidence. It was APCo, and then plaintiffs, who adduced this evidence, not Marine Builders. Hence, the Rule of Cities Service Oil Co. v. Griffin,357 So.2d 333 (Ala. 1978) (permitting rebuttal of irrelevant evidence offered by opposing party) does not apply. The trial court did not err in disallowing this evidence.
 VII. Whether the trial court erred in giving Marine Builders' juryinstruction pertaining to "The Best Situated Rule."
We reiterate that this case is being reviewed under federal law, not Alabama law.
This requested charge follows:
 "The Court charges the jury that if you find the Alabama Power Company and Marine Builders, Inc., both to be negligent, you can take into account which one of the two companies was best situated to reduce the likelihood of injury. If you find that Alabama Power Company was best situated to reduce the likelihood of injury, then Alabama Power Company would not be entitled to indemnity from Marine Builders."
Whether or not the giving of this instruction was error, we believe, must be considered in the framework of APCo's claim *Page 183 
for indemnity and contribution, and the trial court's other pertinent charges:
 "Their [APCo's] theory is that the liability of the Alabama Power Company, if there is any because of such negligence, that their negligence, that is the Alabama Power Company's negligence, is only what we call passive negligence and that the negligence of Marine Builders is alleged to be active negligence and because of the fact that Marine Builders was actively negligent, that Marine Builders should indemnify Alabama Power Company for any amount that they have to put out to the plaintiffs in this case, the original plaintiffs, plural. That is what we call active and passive negligence. That is what is referred to as indemnity and that is what is alleged in the third party complaint.
 "The second cause of action against Marine Builders alleges that Marine Builders was negligent, as I have already indicated it to you. That it doesn't go off on the legal theory of active and passive negligence, but it says that Marine Builders were negligent and that if Alabama Power Company has to pay anything, that if the jury determines that Alabama Power Company was negligent, then Alabama Power Company says that Marine Builders were also negligent and therefore Marine Builders should contribute to the damages as suffered by Alabama Power Company and which are adjudged to be paid by Alabama Power Company. That legal theory is called under admiralty law, the legal theory of contribution.
 "The first cause of action was known as indemnity, that is, for the whole amount. The second is contribution not for the whole amount, but for some contribution.
". . . .
 "I must talk to you now about active and passive negligence as alleged in the third party complaint. The issue of active and passive negligence is raised by the third party plaintiff, the Alabama Power Company, in their third party complaint against Marine Builders and Bangor Punta. Active negligence consists in the doing of something which one is under an obligation not to do. This is sometimes called primary negligence or affirmative negligence.
 "Passive negligence consists of the failure to do something which one is under a legal duty to do. This is sometimes called secondary negligence. This classification of negligence affects the right of indemnification as claimed by the Alabama Power Company in the third party complaint against Marine Builders. . . . If you are satisfied from the preponderance of the evidence in this case that Marine Builders . . . [was] negligent and that negligence of . . . Marine Builders was active negligence, then you should consider that the Alabama Power Company should be indemnified as to the judgment that would be rendered against the Alabama Power Company in the original complaints. If you determine from the preponderance of the evidence that the negligence of Marine Builders . . . was not active negligence but at most only passive negligence, then the Alabama Power Company would not be entitled to any indemnification.
 "Now, let's go to contribution. If you determine that the Alabama Power Company was negligent and if you are reasonably satisfied from a preponderance of the evidence in this case that the third party plaintiff, the Alabama Power Company, has proven by a preponderance of the evidence to your reasonable satisfaction that Marine Builders . . . was also negligent as claimed by the Alabama Power Company in the third party complaint against . . . Marine Builders . . ., then you should determine the degree of such negligence of the parties and you should award a contribution to be made by that party whose negligence you determine and such contribution should be made in proportion to the degree of negligence you determine. If, on the other hand, you are reasonably satisfied from a preponderance of the evidence that Marine Builders . . . [was] not negligent as alleged by the Alabama Power Company, *Page 184 
then you should make no verdict of contribution and would render a verdict for Marine Builders. . . . Again, the distinction between contribution and indemnity is this: Contribution distributes loss equally among all the tort-feasors while indemnity seeks to transfer the entire loss of one tort-feasor to another who in equity and justice should bear it."
Insofar as indemnity is concerned, it has been stated that:
 "[W]here between two successive tort-feasors there is a difference in degrees of culpability, the one guilty of the major dereliction has never been allowed indemnity against the one guilty of the minor. The distinction has sometimes been expressed in terms of `active or passive' negligence, sometimes as `primary and secondary' liability."
Delano v. Ives, 40 F. Supp. 672, 674 (E.D.Pa. 1941). Or, as stated in Maritime Overseas Corporation v. Northeast PetroleumIndustries, Inc., 706 F.2d 349 (1st Cir. 1983), quoting Araujov. Woods Hole, Martha's Vineyard, Nantucket SteamshipAuthority, 693 F.2d 1, 3 (1st Cir. 1982):
"Tort-based indemnification,
 "`[d]esigned to shift the whole loss upon the more guilty of the two tortfeasors . . . has usually been available only where the party seeking it was merely passively negligent while the would-be indemnitor was actively at fault. "Passive negligence" has been limited to instances in which the indemnitee was vicariously or technically liable. Where the party seeking indemnification was itself guilty of acts or omissions proximately causing the plaintiff's injury, tort indemnification is inappropriate.'"
The doctrine of contribution, on the other hand,
 "is one of equality in bearing a common burden, and the right of contribution has been described as the right of one who has discharged a common liability, or burden, to recover of another, also liable, the aliquot portion which such latter person ought to pay or bear. Indemnity, on the other hand, generally refers to the right of a person who has been compelled to pay out money which, in justice, another ought to pay, to recover the entire sum so paid from the latter. Hence, it has been said that in an action for indemnity, the defendant may be liable for the whole outlay while in contribution he is chargeable only with a ratable proportion."
Anno. 53 A.L.R.3d 184, 190 (1973).
The instruction in question was tantamount to charging that if APCo was in a better position to appreciate the risk of injury and avoid the danger, particularly where the danger was within the control of APCo and its employees, APCo would not be entitled to indemnity. This principle has been recognized in negligence cases under the Longshoremen's and Harbor Workers Compensation Act and appears equally appropriate here. The evidence clearly established the control of APCo over the power line, and so, in view of the trial court's entire charge on APCo's right to indemnity, including the distinction between active and passive negligence, we find no error in the giving of this charge. Cf. Scindia Steam Navigation Co., Ltd. v.Santos, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981), andRyan Stevedoring Co. v. Pan-Atlantic Steam. Corp.,350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956) (employing both the warranty theory and the negligence theory of liability tomeasure the right to indemnity of one best situated to avoidthe injury). At most the charge might have been considered misleading, and if APCo so considered it, an explanatory instruction could have been requested. Authorities, supra.
Let the judgments be affirmed.
AFFIRMED.
TORBERT, C.J., and MADDOX, JONES and SHORES, JJ., concur.
[1] § 1333 (1): "Any civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled."
[2] See 46 U.S.C. § 741 et seq.
[3] APCo alleged that this sailboat was "designed, manufactured, and sold . . . in a defective condition and was unreasonably dangerous to the ultimate users or consumers."
[4] Such a power line, also known as a 12-KV line, was later explained in evidence as the same as a 7,200 volt line when measuring voltage between a conductor and the ground. On the day of this accident, the line in question was a 12-KV line.
[5] Some 13 days prior to trial APCo filed a second amendment to its third-party complaint, alleging that Bangor Punta and Marine Builders were guilty of wanton misconduct. Upon motions and after hearing, this amendment was struck. APCo does not attack the exercise of the trial court's discretion in taking that action, but argues that the trial court should have instructed the jury on its right to recover punitive damages based upon the evidence. *Page 185